552 So.2d 52 (1989)
Constance L. SAVELLE, Plaintiff-Appellant,
v.
Dr. Mark R. HEILBRUNN, et al., Defendants-Appellees.
No. 88-774.
Court of Appeal of Louisiana, Third Circuit.
November 8, 1989.
Writ Denied January 19, 1990.
*53 Lewis & Kullman, Lawrence S. Kullman, New Orleans, Hunter & Plattsmier, Charles B. Plattsmier, Morgan City, for plaintiff-appellant.
Carruth, Cooper & Adams, Ambrose K. Ramsey III, Baton Rouge, for defendants-appellees.
*54 Before STOKER, DOUCET and LABORDE, JJ.
LABORDE, Judge.
This is a medical malpractice case. The plaintiff, Constance L. Savelle, originally sued defendants, Dr. Mark R. Heilbrunn and Lafayette General Hospital, alleging that Dr. Heilbrunn negligently failed to diagnose plaintiff's cancer of the uterus, resulting in a 14 month delay in treatment. Subsequently, plaintiff settled her claim with Dr. Heilbrunn and his insurer, Louisiana Medical Insurance Company (LAMMICO), for $100,000.00, the limit of his insurance policy.[1] Seeking additional compensation for her damages, plaintiff amended her petition to add the Louisiana Patient's Compensation Fund (the Fund), as a defendant. Trial was held and on March 10, 1988, the jury returned a verdict finding that Dr. Heilbrunn's negligence was not a proximate cause of plaintiff's injuries. Thus, all claims for damages were denied. The trial court entered judgment on March 21, 1988, in favor of the Fund. It later denied plaintiff's motion for a new trial and expedited hearing and/or judgment notwithstanding the verdict. Plaintiff now appeals, asserting that the jury's verdict was erroneous. We reverse.

FACTS
On July 12, 1984, plaintiff, then 46 years old, was admitted by Dr. Stanley Morgan to Lafayette General Hospital with a diagnosis of uterine fibroids. Upon Dr. Morgan's recommendation, plaintiff underwent a total abdominal hysterectomy and bilateral salpingo-oophorectomy which required the removal of her uterus, tubes and ovaries. This surgery was performed on July 13, 1984. During the surgery, Dr. Morgan's general exploration of the upper abdomen revealed palpably normal kidneys, liver, spleen, and gall bladder. The uterus, tubes and ovaries were sent to pathology for examination. Dr. Heilbrunn examined the tissue samples and reported no evidence of malignancy. Following the operation, plaintiff was discharged to her home.
In the summer of 1985, plaintiff visited Dr. Al Rees complaining of back pain. She received medication and began physical therapy. However, her back pain persisted and she saw Dr. Charles Oliver on August 27, 1985. He diagnosed a lumbosacral strain and bursitis. Plaintiff returned to Dr. Olivier on September 11, complaining of pain in her low back and right hip. Dr. Olivier gave her an injection for the pain and told her to return in three weeks. On September 22, 1985, plaintiff reported to the emergency room of Lafayette General Hospital complaining of severe back pain. A CAT scan of the lower abdomen and pelvis revealed a tumor mass extending into the spine from the level of T-12 to L-1. A needle biopsy of the mass was performed which showed that the mass was malignant, a leiomyosarcoma. Dr. Brian Barnes, an oncologist was consulted. In reviewing the tissue slides from plaintiff's 1984 operation with Dr. Donald Wade West, a pathologist at Lafayette General Hospital, Dr. Barnes determined that she had, in fact, had cancer at that time. Dr. Barnes initiated combination chemotherapy treatment which successfully reduced plaintiff's pain.
In April of 1986, Dr. Barnes referred the plaintiff to M.D. Anderson Hospital and Tumor Institute in Houston, Texas where she was evaluated by Dr. Nicholas Papadopoulos, a specialist in the treatment of cancer. Dr. Papadopoulos determined that the size of the tumor in plaintiff's back had been reduced following the initiation of chemotherapy. He also determined that there was an improvement in plaintiff's symptoms and that plaintiff's pain had been alleviated. Dr. Papadopoulos recommended that the combination chemotherapy initiated by Dr. Barnes be continued. He then referred plaintiff back to Dr. Barnes for the handling of her case.
Dr. Papadopoulos next saw the plaintiff in June of 1986. He found at this time that the chemotherapy had resulted in further improvement of her disease and further reduction of the tumor mass. Plaintiff was virtually pain-free at this time. Dr. Papadopoulos's *55 evaluation indicated that there was now no evidence of disease inside the spinal canal and also showed that the disease near the L1 vertebra appeared to be healing. The studies also indicated continual improvement of the mass around the spinal canal and of the soft tissues around the spine. Based upon the findings at that time, it was decided that the same course of therapy would be continued.
In August of 1986, Dr. Barnes wrote that plaintiff had had a "spectacular response to previous chemotherapy." Approximately twelve to fourteen months after starting the treatment, plaintiff's disease was very well controlled. At one point, Dr. Barnes thought that the plaintiff might be in complete remission. Dr. Papadopoulos saw the plaintiff in February of 1987 at which time her condition was stable with no further progression of the disease. Dr. Papadopoulos noted at this time that "[s]ince the initiation of the chemotherapy, the performance status of the patient has improved remarkably." Plaintiff did not require medication for pain and was able to perform exercises and activities.
In April of 1987, plaintiff's physicians decided to discontinue treating her with the drug, Adriamycin, as there was a limit to the accumulative amount of this medication which could be safely administered. By the fall of 1987, plaintiff was well enough to return to her job as a teacher. Dr. Barnes estimated that he had been able to kill 80% to 90% of the tumor cells.
Unfortunately, in September of 1987, plaintiff suffered a recurrence of the disease. She returned to Dr. Barnes complaining once again of back pain. Dr. Barnes sent off specimens of the tumor to Nashville, Tennessee in order to ascertain what drugs the tumor would be sensitive to at that time. The tests showed that the cancer cells were not sensitive to any of the nine drugs tested. The only treatment available to plaintiff involved the use of experimental medication not yet approved by the F.D.A. Plaintiff saw Dr. Papadopoulos in November, 1987, complaining of pain in the left buttock and low back. An evaluation showed that the disease was now progressing. Dr. Papadopoulos gave plaintiff an experimental drug, but it was not effective. Plaintiff also received radiation therapy because the tumor was growing rapidly and pressing on plaintiff's spinal cord, causing her considerable pain. In spite of this treatment, plaintiff's condition worsened. She developed weakness in her legs and loss of bladder control. At the time of trial, plaintiff was in severe pain, confined to her home and requiring 24 hour-a-day nursing assistance.

SPECIAL VERDICT
On appeal, plaintiff argues that the trial court erred in submitting an improper verdict form to the jury, over plaintiff's objection. We agree.[2]
The Louisiana Medical Malpractice Act places a $100,000.00 maximum on a health care provider's liability. It also provides a $400,000.00 supplemental amount available to each injured person, payable from the State operated Fund. Thus, the total amount recoverable may not exceed $500,000.00 and any damages in excess of $100,000.00 are payable by the Fund. Where, as in the instant case, the settlement is for the $100,000 maximum, liability is admitted pursuant to LSA-R.S. 40:1299.44 C(5). That statute provides, in pertinent part, as follows:
"If the commissioner, the insurer of the health care provider or the self-insured health care provider as the case may be, and the claimant cannot agree on the amount, if any, to be paid out of the patient's compensation fund, then the court shall determine the amount of claimant's damages, if any, in excess of the amount already paid by the insurer of the health care provider. The court shall determine the amount for which the fund is liable and render a finding and judgment accordingly. In approving a settlement or determining the amount, *56 if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars." [Emphasis added]
In Moolekamp v. Rubin, 531 So.2d 1124 (La.App. 4th Cir.1988), the Fourth Circuit thoroughly analyzed the issue of the effect of the admission of liability set forth in LSA-R.S. 40:1299.44 C(5). The Moolekamp court noted that to establish defendant's liability, the plaintiff must prove that defendant's fault caused him some damage. That is, if plaintiff can prove that defendant breached a legal duty imposed to protect plaintiff against the risk of the harm which occurred, defendant's liability is established. Moolekamp, supra at 1126-7. Accordingly, when liability is admitted and established pursuant to LSA-R.S. 40:1299.44 C(5), the court is statutorily instructed to accept as proven that the health care provider's fault (i.e., his substandard performance of a legal duty owed to the plaintiff for protection from the harm which befell him) has caused plaintiff some damage. "From there, if the patient demands additional compensation, the Court, considering liability established, hears evidence to decide what damage (some damage having been established) was caused by defendant's fault, and to determine what amount, if any, is to be paid from the Patient's Compensation Fund." Moolekamp, supra at 1127.
In the instant case, the trial court submitted a verdict form to the jury with the following interrogatories:
1. Was the admitted fault of the defendant a proximate cause of some or all of the injuries sustained by the plaintiff?
 Yes ___ No___
Note: If your answer to question 1 was "Yes," answer question 2. If you answered "No" to question 1, go no further, sign and date the form and return to the courtroom.
2. In terms of dollars, how much in total damages did the plaintiff sustain as a result of the defendant's fault?
 $___________________
The jury answered "No" to the first interrogatory. Thus, it rejected the plaintiff's claim on the ground that the defendant's conduct had not caused any damage to the plaintiff. This verdict was clearly improper since liability for some damage was admitted as a matter of law.
"If the trial court submits a verdict form to the jury with misleading or confusing interrogatories, just as when it omits to instruct the jury on an applicable essential legal principle, such interrogatories do not adequately set forth the issues to be decided by the jury and may constitute reversible error. The manifest error standard of appellate review may not be ignored unless the proposed jury interrogatories are so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and the facts." Lewis v. Wal-Mart Stores, Inc., 546 So.2d 267 (La.App. 3d Cir.1989).
In the instant case, the verdict form submitted to the jury was misleading and confusing. For this reason, we cannot give the usual weight to the jury's assessment of fault. Our duty becomes one of reviewing the evidence and rendering a proper judgment in accordance with applicable law. Lewis v. Wal-Mart Stores, Inc., supra; Porter v. Utica Mut. Ins. Co., 357 So.2d 1234 (La.App. 2d Cir.1978), and cases cited therein.

HARM
An erroneous jury verdict does not warrant a remand of the case when an appellate court has all the facts before it. The appellate court can decide the case on the merits de novo. Lewis v. Wal-Mart Stores, Inc., supra; Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975); Parrino v. Royal Ins. Co. of America, 484 So.2d 282 (La.App. 3d Cir.1986). In determining what amount, if any, is to be paid from the Fund, we must decide what damage was caused by Dr. Heilbrunn's fault, the degree of seriousness of that damage, *57 and choose a monetary amount as compensation to the plaintiff for that damage. Thus, the fact that liability is established does not relieve the plaintiff from proving the extent of the damages caused by defendant's fault. Liability implies some damage but not specifically which or how much damage. "Defendant is liable only for that damage caused by his fault; whatever harm has befallen plaintiff must be apportioned into that caused by defendant (which could be all of the harm) and that caused by any other source (other defendants, third-parties, `acts of God', the plaintiff.)" Moolekamp at p. 1127.
Our review of the record convinces us that plaintiff was seriously harmed as a result of Dr. Heilbrunn's misdiagnosis. Plaintiff's treating physician, Dr. Barnes, testified that the failure to diagnose her cancer in July of 1984, caused her to suffer harm. He stated that if the cancer had been diagnosed properly at that time, plaintiff's physicians would have then attempted to determine if there was any remaining disease in her body. If they had detected disease, they would immediately have started chemotherapy treatment with a "reduced tumor burden," thereby lessening the likelihood of tumor cells becoming resistant to the treatment. On the other hand, if no tumor had been detectable at that point, the physicians would have, at the very least, given plaintiff abdominal pelvic scans and chest x-rays every three to four months to check for any recurrence of the disease. In Dr. Barnes's opinion, if plaintiff's condition had been followed closely, her cancer would probably have been diagnosed earlier than it was. He responded as follows, when questioned about the harm plaintiff suffered because of the misdiagnosis:
"Q. Dr. Barnes, in your opinion, if Connie's disease had been diagnosed when it should have been diagnosed and she had been treated properly, do you think she would have had a longer period of time free of disease and free of disease symptoms?
A. I think any opportunity for that was lost by not diagnosing it and not treating it. I can't give you anything other than an opinion.
Q. I understand.
A. But my opinion is she probably would have done better.
Q. Dr. Barnes, is that based primarily on the fact that she was such a responder to chemotherapy?
A. Looking back, yes.
* * * * * *
Q. And it is your opinion that it is likely, at least nothing can be certain in this world, but it is likely if the tumor had been smaller when the therapy had been done, it would have been even more successful?
A. I think that that is probably the case.
* * * * * *
Q. Will you agree though that it is reasonably likely, given she was such a spectacular responder to the chemotherapy she received, that her chances of cure would have been better.
(Witness nodding head affirmatively)
A. I think that is fair to say."
Dr. William Stein, an expert in medical oncology called by the plaintiff, also testified concerning the harm caused by the fourteenth month delay in the diagnosis and treatment of plaintiff's cancer. Dr. Stein opined that this delay made a significant difference to plaintiff's chances of being cured. According to Dr. Stein, when the diagnosis of plaintiff's cancer was missed in July of 1984, she had stage one (1) disease.[3] He noted that as a result of the delay the tumor grew in size and spread far beyond the limit of the original organ where it was first found. Thus, when it was ultimately found in September of 1985, plaintiff had stage four (4) disease. Dr. Stein testified that a person treated at stage one (1) disease with optimal therapy *58 has a 70% to 80% chance of survival for five years. If diagnosed and treated when the disease is stage four (4), the chance of survival for five years becomes less than 25%.
Dr. Stein also testified that Dr. Heilbrunn's negligence made a significant difference with respect to plaintiff's chance of having a longer period of disease-free survival and with respect to the amount of pain she suffered. In his view, because plaintiff responded so well to the chemotherapy, had she been treated earlier, it can be assumed that "the tumor would have gotten even significantly smaller and there would have been a much longer time before it reappeared." Thus, according to Dr. Stein, plaintiff's "disease-free survival would have been extended[i]t is hard to say how long but considerably." Furthermore, Dr. Stein testified that had plaintiff received adequate therapy early enough, her tumor spread might not have been the same.
"Q. Dr. Stein, what about her pain? Do you think insofar as the pain she is experiencing, that an early diagnosis and treatment would have made a significant difference?
A. Yes, sir.... You know, it is difficult to say that with a hundred (100) per cent certainty, but I think that it is fairly safe to say first, it might have not have spread the way it did. In other words, it might have gone to her lung at some much later time or it might not have come back at all or it might not have invaded her spinal cord or the nerves that come out of the spine that caused the degree of pain that it did. Furthermore, we cannot miss the fact that there is some possibility that it might not have recurred at all. And even had she recurred in the same place that she did despite therapy, it might have at least prevented that from happening for some considerable period of time."
Defendant's experts testified that generally plaintiff's type of cancer is not responsive to chemotherapy and that it is incurable. Dr. Richard Reed, a pathologist, testified that essentially the treatment for patients suffering from leiomyosarcoma is surgical. He stated that "[o]ther then that, mostly we are, we are playing with modalities and do not have anymajor form of treatment." Dr. Reed further testified that there was evidence in the literature indicating that a response to chemotherapy in a patient of this type does not influence survival. According to Dr. Reed, plaintiff's prognosis and course were determined at the time of surgery in July of 1984.
Dr. Philip Krupp, a gynecologic oncologist, testified that, based on his personal experience, chemotherapy did not prolong the lives of patients having this form of cancer. In Dr. Krupp's view, the only treatment for plaintiff's disease was surgery. Dr. Krupp further testified that he didn't know whether chemotherapy had destroyed plaintiff's tumor cells in this instance, but that even if it had, he did not think that earlier treatment would have prolonged plaintiff's life.
Dr. Lee Roy Morgan, an oncologist specializing in clinical pharmacology, was the last expert to testify for the defendant. The thrust of Dr. Morgan's testimony was that early initiation of chemotherapy is not very effective against uterine leiomyosarcoma. Dr. Morgan theorized that plaintiff's tumor responded to chemotherapy because it was large enough to have developed its own blood supply. The drugs acted against the tumor by cutting off its blood supply. When this happened, there was no further contact with the drugs and the tumor remained stable. Under cross-examination, Dr. Morgan admitted that the reason the chemotherapy ceased to kill the tumor cells may have been because they had become resistant to the treatment.
After carefully reviewing the medical testimony in this case, we find that the plaintiff has sustained her burden of showing that she would have benefited from early diagnosis and treatment. The testimony of plaintiff's treating physicians, Dr. Barnes and Dr. Papadopoulos shows that if *59 the cancer had been detected in July of 1984, there would have been at least a chance that it could have been successfully treated and, even if not cured, its growth slowed or arrested. As a result of Dr. Heilbrunn's misdiagnosis, plaintiff was deprived of the opportunity to receive early treatment and the chance of realizing any resulting benefit in physical and mental comfort or life expectancy. Thus, the progressive evolution of the malignancy during the fourteen month period until plaintiff received proper medical attention constitutes a cognizable harm.

DAMAGES
Because we have an adequate record of plaintiff's damages before us, rather than remanding this case, we will make an assessment of the damages due to plaintiff. LSA-C.C.P. art. 2164. In making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm. Rather, we set the award in an amount which is just compensation for the damages revealed by the record. Lee v. Great Southwest Fire Ins. Co., 493 So.2d 789 (La.App. 2nd Cir.1986).
In the instant case, the delay in diagnosis caused both a physical and an emotional injury. The evidence clearly shows that plaintiff has suffered a tremendous amount of pain and discomfort since September of 1985. At the time of trial, plaintiff is totally disabled. She requires 24 hour-a-day nursing assistance as she cannot walk, bathe, or use the restroom without help. The growth of the tumor against plaintiff's spinal cord has caused her severe pain and interfered with her bladder control. Plaintiff requires large amounts of morphine and other pain medication merely to control her pain. According to Dr. Barnes, these medications will never eradicate plaintiff's pain. Dr. Papadopoulos testified that as of February 29, 1988, plaintiff's prognosis was poor. He did not expect her to live beyond a year.
The record also reflects that plaintiff suffered mental and emotional pain including mental anguish stemming from her awareness of the delayed diagnosis and treatment. Plaintiff testified that she was nearly hysterical upon learning that she had been untreated for fourteen months. She further detailed her continuing mental distress subsequent to chemotherapy. Plaintiff stated: "It affects you emotionally; and each day, I had to cope with the problem of why. We all think, Why me? What happened? Why would something like this happen to me?"
We are convinced that plaintiff lost any chance of a cure or of a longer period of disease-free survival because of defendant's misdiagnosis. Plaintiff also suffered physical and mental pain she otherwise would not have suffered; and she incurred substantial medical expenses and lost earnings.[4] In choosing a monetary amount as compensation to the plaintiff for the damage caused by the defendant, we recognize the difficulty involved in quantifying the chance of prolonging one's life or decreasing suffering. In our view, the general damages for disability and pain and suffering resulting from the reduction of plaintiff's life expectancy and its effect on the quality of plaintiff's life, added to the loss of future earnings and medical expenses equals an amount well over $500,000.00. See Knopfer v. Louisiana Patient's Compensation Fund, 527 So.2d 326 (La.App. 4th Cir.1988).
For the above stated reasons, we reverse the trial court judgment denying the plaintiff any recovery.
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, Constance L. Savelle and against defendant, Louisiana Patient's Compensation Fund, for the sum of $400,000.00, *60 together with legal interest from the date of judicial demand until paid. Defendant is cast for all costs at the trial level and at the appellate level.
REVERSED AND RENDERED.
NOTES
[1] Lafayette General Hospital was also dismissed from this suit without prejudice.
[2] In view of our decision to reverse the trial court's judgment, we deem it unnecessary to address plaintiff's other assignments of error.
[3] Cancer patients are staged at the time they are diagnosed for prognostic and statistical purposes. Stage one (1) disease is defined as disease localized to the original organ that it started in with no clinical evidence of spread anywhere else.
[4] Dr. Philip Jeffress, an expert economist, testified that as of the date of trial, plaintiff's past loss of earnings totalled $39,428.00. He testified that the present value of plaintiff's future loss earnings (assuming that her disease allowed her to work for five years after July 1984) would be approximately $31,857.00. In addition, plaintiff, as of the date of trial, required 24 hour-a-day nursing care at a cost of $180.00 per shift or $540.00 a day. This amounts to $197,100.00 a year.