691 So.2d 882 (1997)
MORRIS & DICKSON COMPANY, INC., Plaintiff-Appellee,
v.
JONES BROTHERS COMPANY, INC. and Commercial Union Insurance Company, Defendants-Appellants.
No. 29379-CA.
Court of Appeal of Louisiana, Second Circuit.
April 11, 1997.
*884 Simon, Peragine, Smith & Redfearn by Denise C. Puente, Daniel J. Caruso, and J. Thomas Hamrick, Jr., for Defendants-Appellants.
Taylor, Porter, Brooks & Phillips by Tom F. Phillips, for Plaintiff-Appellee.
Before NORRIS, HIGHTOWER and CARAWAY, JJ.
CARAWAY, Judge.
Conceding in this appeal the issue of its liability for a leaking underground gasoline storage tank, defendant, Jones Brothers Company, Inc. ("Jones"), appeals a jury verdict in favor of the plaintiff, Morris & Dickson Company, Ltd. ("M & D"), rearguing primarily that plaintiff's claims have prescribed. Additionally, Jones seeks review of the award for damages and interest and disputes the plaintiff's claim for attorney fees pursuant to the "Citizen Suits" provisions of La.R.S. 30:2026 of the Department of Environmental Quality Act, La.R.S. 30:2001 et seq. For the reasons stated hereinbelow, we affirm in part and reverse in part the rulings below and render judgment accordingly.

Facts
The Morris & Dickson Company, Ltd. is a wholesale distributor of pharmaceutical products located in Shreveport, Louisiana. In 1984, the company moved from downtown Shreveport to a newly constructed location south of town. M & D, the owner of the new premises, acted as its own general contractor in building the new facility, obtaining a building permit and contracting with other contractors to perform the various aspects of the job.
M & D wanted to provide a gasoline fueling facility for its fleet of delivery trucks. Toward this end, M & D sought a proposal from Jones to furnish and install two underground storage tanks (hereinafter "UST") with appurtenances that would allow M & D to fuel the delivery trucks. A proposal was submitted by Jones and accepted by M & D with certain modifications. These modifications addressed, among other things, the digging of the sites for the tanks by another contractor selected by M & D. According to testimony by M & D's president, Skipper Dickson, Jones was to provide its knowledge and expertise to M & D for the design, safety features, permits and the regulation compliance for the tank facility, and was to furnish the gasoline system and supervise its installation. The final invoices and other pertinent documents in the record indicate that total charge for goods and services supplied by Jones to M & D was $10,492. The sales price of the tanks and appurtenances was $5,806, indicating that the services provided by Jones were $4,686, or roughly 45% of the total invoice.
The two tanks, one with 4000 gallon capacity and the other with 6000 gallon capacity, were installed in 1984. The tanks were shaped in the form of large, horizontal cylinders with flat, vertical ends. As agreed, M & D contracted some of the excavation and installation work itself, with Jones overseeing all of the work and performing other installation *885 aspects of the job, which was performed from late February until April.
In early 1987, M & D realized that problems it had recently experienced with its fleet of trucks indicated that there was water in the gas coming from their storage tanks. M & D contacted Jones in early February regarding the problem. An employee from Jones discovered 5 ½ inches of water accumulated in the 4000 gallon tank. The water was pumped out of the tank by Jones. Problems with the water continued. The same problem occurred in subsequent months into 1988. The source of the water was unknown and according to M & D, Jones came on a regular basis to fix the problem and kept attempting to find the source of the problem. Eventually, in December of 1988, a leakage test known in the industry as a petrotite test was attempted on the 4000 gallon tank. The test was aborted, however, when it was ascertained that the tank or the system could not hold the requisite test pressure, which indicated a substantial leak in the tank or appurtenances.
In February, 1989, M & D and Jones decided to jointly dig the 4000 gallon tank out of the ground. Present at the time of the tank's removal was an inspector from the Louisiana Department of Environmental Quality ("DEQ"). A ½-inch hole was discovered in an area of corrosion near the top of one of the ends of the tank. It was also found that there had been groundwater contamination which would require remediation. On March 16, 1989, the DEQ issued an order to M & D to begin steps to clean up the site.
The hole in the tank was apparently caused by corrosion. The question was why the corrosion occurred so rapidly, perforating the tank in three years, when the life expectancy of such a tank is usually 20 to 30 years, but a very minimum of 10 years. Evidence presented at trial questioned whether the cause of the hole in the tank was due to either the failure to install anodes for "cathodic" protection[1] against corrosion, installation of inadequate anodes, the failure to seal the tank with a mastic substance such as asphalt, mechanical damage to the tank, highly corrosive soil, or some, none, or all of the above.
Mr. Kevin Garrity, an engineer testifying for M & D as an expert in corrosion of underground tanks, viewed the tank in 1993, some 4 years after it had been excavated from the ground, and after it had been cleaned up and transformed into an aboveground tank. He testified that there was no evidence of the protective coating present on the tank that is typically applied to prevent corrosion in underground tanks. He also testified that he did not see evidence of a cad-weld on the outside of the tank. Although he could not pinpoint the exact cause for the problem and expressed surprise at the extent of the corrosion arising in only three years of underground use, he concluded that the hole was caused either by the absence of cathodization or the improper installation of anodes coupled with mechanical damage to the tank at the place where the hole developed.
Testimony also showed that the soil at the site was highly corrosive. With such soil, M & D argued that the installation of the 17 pound anodes used, coupled with other circumstances, would have been insufficient to provide cathodic protection against corrosion.
Jones contends that it properly installed magnesium anodes to the tanks to provide the requisite cathodic protection. It presented the testimony of William "Bill" Jones, Jr., vice-president, and John Hodges, an employee of 27 years, that they together installed the anodes on the tanks using a cad-weld. Bill Jones also testified that the tanks had a black asphalt mastic coating. Hodges, now retired, corroborated Jones' testimony describing in detail the removal of the mastic coating on the tank to perform the cad-weld. Additionally, Daryl Guyton, the salesman for Jones who negotiated the deal with M & D, testified that M & D's Mark Dickson wanted four magnesium anodes for cathodic protection, but did not specify the size. Guyton *886 discussed the proper size with a Dr. Greco of F.W. Corrosion Company where later Jones purchased the anodes.
Following removal of the tank and the March 16, 1989 order from DEQ, M & D retained Southern Services to propose to the DEQ a plan of remediation. The plan was tentatively approved by DEQ on March 14, 1991 and ultimately involved the pumping of groundwater from four wells in the area around the tank site into an aerator to strip it of the gasoline and then discharge it into a filtration gallery. The pumping began in 1992. CK Associates replaced Southern Services in 1993 as M & D's environmental contractor.

Procedural History
M & D filed suit in August of 1991 against Jones and its insurer, Commercial Union Insurance Company, alleging that Jones improperly installed the tanks by failing to provide cathodic protection. Jones filed a peremptory exception of prescription alleging that the claim sounded in tort and had prescribed under the one-year prescription. The exception was overruled, and thereafter, the litigation evolved with the parties' contract being the primary focus of the dispute. Jones has renewed its exception of prescription on this appeal, claiming as it did at trial that the agreement was a contract of sale and that the plaintiff's claim is subject to the one-year liberative prescription applicable to claims for redhibitory defects.
The jury trial held in January of 1996 resulted in a verdict in favor of M & D. In reaching the verdict the jury was presented with the following special interrogatories in an apparent effort to address the issue of the nature of the contract and its breach:
Question 1 Please check the appropriate description for
the agreement between Jones Brothers, Inc. and Morris
& Dickson Co., Ltd.
 Contract to Build___________
 Or;
 Contract of Sale____________
 Or;
 Both Contract to Build and Contract of Sale √ 
Question 2 Has plaintiff established by a preponderance
of the evidence, that Jones Brothers, Inc., through its
employees or representatives, breached the agreement
with Morris and Dickson Co., Ltd?
 Yes √ No_______
The jury awarded damages in the amount of $142,000 for all prior costs expended by M & D, including the remediation cost for the wells, pumps and groundwater filtration system and the costs of monitoring the system and semi-annually reporting to the DEQ through the time of trial. Jones does not appeal this award of the actual costs through trial.
Additionally, the jury awarded $182,400 as the cost of future remediation. This amount was based upon the testimony of Mr. Gary Fulton of CK Associates, who was accepted as an expert in environmental hydrogeology. Fulton recommended that four additional wells be drilled to conclude the remediation and he estimated the costs of such future efforts to range from $204,000 to $244,000. Jones disputes the jury's verdict for cost of future remediation based upon testimony that the existing system approved by DEQ is apparently functioning properly at a cost of approximately $10,000 per year.
A judgment pursuant to the jury verdict was rendered by the trial court on February 21, 1996 in favor of M & D and against Jones for $324,400 plus legal interest from the date of judicial demand and for all court costs. Pursuant to the judgment, a subsequent motion was filed to fix expert witness fees and assess them as court costs and to obtain an award under the citizen suits claim for attorney fees which was deferred in the original judgment. After considering evidence and hearing argument on the motion, the court rendered a second judgment against the defendants casting them for $1,372.77 in court costs, $280.89 for expenses related to a deposition used at trial, $6,449.14 in expert witness fees and expenses for two experts, and $121,829.32 in attorney fees.
Jones appeals the judgment alleging the following five assignments of error:
(1) The trial court erred in rendering judgment based on the jury's finding that the purchase and sale agreement between M & D and Jones was "both" a contract of sale and a construction contract. That finding was manifestly erroneous or clearly wrong.

*887 (2) The trial court erred in denying Jones' peremptory exception based upon the liberative prescription of one year.
(3) The trial court erred in awarding M & D $182,400 for future clean-up costs.
(4) The trial court erred in awarding interest from judicial demand on "future cleanup costs" when such costs have yet to be incurred.
(5) The trial court erred in rendering judgment against Jones for attorney and expert witness fees incurred by M & D.
M & D answers Jones' appeal alleging as an assignment of error the trial court's failure to include in the costs and attorney fee award in favor of M & D and additional $3,103.15 in deposition costs actually incurred in preparation for trial.

Discussion
Assignments of Error Numbers 1 and 2 Prescription
Jones' first two assignments of error concern the issue of the one-year prescription for redhibition, which it claims is applicable to the breach of contract in this instance. Thus, by its first assignment of error, Jones claims that the jury manifestly erred or, alternatively, erred as a matter of law in concluding that the agreement between Jones and M & D was both a contract of sale and a contract to build. Jones' position is that the agreement was a contract of sale and, as such, it follows that the purchaser's remedy for latent defects sounds in redhibition, for which suit must be filed (at the latest) within one year after the discovery of the defect in the product sold. La.C.C. art. 2534 and former La.C.C. (1870) art. 2546.[2] Because suit was filed more than one year after M & D's discovery of the corroded leaking tank, Jones contends that the trial court erred in overruling its peremptory exception of prescription. M & D argues that the contract should be characterized as a contract to build or install the UST system and the breach of contract is subject to ten-year liberative prescription.
In this case, in special jury Interrogatory Number One, the jury was asked whether the agreement between M & D and Jones was a contract of sale, a contract to build, or both a contract of sale and a contract to build. Like hedging one's bet on a bar exam question, the jury, not surprisingly, chose the third option, the sale/construction combination, which is of no benefit in addressing this difficult issue of prescription. Likewise, the jury's response to Interrogatory Number Two that a breach of contract had occurred, did not identify the breach as specifically resulting from the existence of a redhibitory defect.
"If the trial court submits a verdict form to the jury with misleading or confusing interrogatories, just as when it omits to instruct the jury on an applicable essential legal principle, such interrogatories do not adequately set forth the issues to be decided by the jury and may constitute reversible error. The manifest error standard of appellate review may not be ignored unless the proposed jury interrogatories are so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and the facts." Savelle v. Heilbrunn, 552 So.2d 52 (La.App. 3d Cir.1989); Lewis v. Wal-Mart Stores, Inc., 546 So.2d 267 (La.App. 3d Cir.1989).
In the instant case, the verdict for Interrogatory Number One, which was unquestionably submitted with the issue of prescription in mind, was wholly inadequate. The jury interrogatories and their responses fail to answer the critical question regarding the character of the contract and the nature of the breach for which the jury awarded damages. For this reason, we cannot give the usual weight to the jury's findings in this regard. Our duty becomes one of reviewing the evidence and rendering a proper judgment in accordance with applicable law. Porter v. Utica Mutual Insurance Company, 357 So.2d 1234 (La.App. 2d Cir.1978), and cases cited therein; Savelle v. Heilbrunn, supra; Lewis v. Wal-Mart Stores, Inc., supra. An erroneous jury verdict does not *888 warrant a remand of the case when an appellate court has all the facts before it. The appellate court can decide the case on the merits de novo. Savelle v. Heilbrunn, supra; Lewis v. Wal-Mart Stores, Inc., supra; Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975); Parrino v. Royal Ins. Co. of America, 484 So.2d 282 (La.App. 3d Cir. 1986).
A prerequisite to determining liabilities of plaintiff and defendant toward one another is the correct characterization of the nature of the contract between them. Acadiana Health Club, Inc. v. Hebert, 469 So.2d 1186 (La.App. 3d Cir.1985). The character of the action determines the applicable prescriptive period. American Heating & Plumbing Co. v. West End Country Club, 171 La. 482, 131 So. 466, 469 (1930); Sharpe v. Claiborne Enterprises, Inc., 461 So.2d 591 (La.App. 1st Cir.1984). See also, 7 Saul Litvinoff, La. Civil Law Treatise: Obligations, Book 2, § 158, pp. 289-292 (West 1975). If it is a sale, La.C.C. arts. 2520 et seq., which deal with redhibitory defects, are applicable. On the other hand, if the contract was a construction contract or a contract for work by the job, La.C.C. arts. 2756 et seq. are applicable. Acadiana Health Club, Inc., supra. Actions for damages caused by the breach or negligent execution of construction or installation contracts, in which the principal obligation is one to do or not to do, prescribe in ten years. La.C.C. art. 3499; Kegler's Inc. v. Levy, 239 So.2d 450 (La.App. 4th Cir.1970), cert. denied 256 La. 1150, 241 So.2d 253 (1970); Yeargain v. Blum, 144 So.2d 756 (La.App. 4th Cir.1962). On the other hand, actions for damages caused by redhibitory defects in things sold prescribe in one year, either from the date of sale or the time of discovery depending upon the good faith of the seller. La.C.C. art. 2534.
Classifications of contracts have occasioned the courts some difficulty where the contract includes aspects of the obligation both to do and to give. Where they are inseparable, generally one of the obligations must be determined as fundamental and the rules thereunder will control. "When different obligations are intimately connected ... one of them must be recognized as fundamental and if it is one to do, for instance, the whole contract will be treated as giving rise to obligations of that kind." 7 Saul Litvinoff, La. Civil Law Treatise: Obligations Book 2, § 157 at 288 (West 1975).
With a sale defined in Civil Code article 2439 as an agreement to transfer the ownership of a thing to another for a price, the jurisprudence has considered three major factors for distinguishing a sale from a contract to build. First, in a contract to build, the "purchaser" has some control over the specifications of the object. Second, the negotiations in a contract to build take place before the object is constructed. Lastly, and most importantly, a building contract contemplates not only that the builder will furnish the materials, but that he will also furnish his skill and labor in order to build the desired object. Duhon v. Three Friends Homebuilders Corporation, 396 So.2d 559 (La.App. 3d Cir.1981); Airco Refrigeration Service, Inc. v. Fink, 242 La. 73, 134 So.2d 880 (1961).
In Acadiana Health Club, Inc. v. Hebert, supra, plaintiff contracted with the defendant to install carpet and linoleum. The plaintiff picked out the carpet it wanted, and the installer ordered the carpet from the manufacturer. From the outset, problems were experienced with the carpet, primarily with the carpet coming apart at the seams. In order to determine the remedies available to the plaintiff, the court first had to determine whether the contract was a sale or a construction contract.
The court found that although plaintiff did not have any say as to the manufacturing specifications of the carpet itself, it did have considerable input as to the object of the contract. The object of the contract was not simply the sale of so many feet of carpet and flooring, but the job of carpeting and flooring the health club facilities. In this regard, plaintiff did specify the type of carpeting and flooring. Most importantly, the contract called upon the skill of the defendant and its employees to install the carpeting and flooring. The court concluded that the contract between plaintiff and defendant was a construction contract.
*889 In Long Leaf Lumber Inc. v. Summer Grove Developers, Inc., 270 So.2d 588 (La. App. 2d Cir.1972), this court, referring to a contract for the installation of an air-conditioning system, stated:
The contract did not involve merely the sale of the air conditioning and heating units. It provided for the installation of the entire heating and air conditioning systems; including design and drawings prepared... major equipment and incidental components, duct work, grilles, registers and duct installation and all piping.
Long Leaf Lumber, Inc., supra at 590. The court went on to find that the contract was not a contract of sale, but a contract to build.
In Austin's of Monroe, Inc. v. Brown, 474 So.2d 1383 (La.App. 2d Cir.1985), this court found that the predominant or fundamental object of a contract to furnish a restaurant with computer hardware, software, and programming to control and monitor its accounting was a contract of sale rather than a contract to do or a making of a work. The defendant Brown proposed to provide the plaintiff restaurant owner with the above goods and services for $10,900, $2,830 of which represented the cost for programming and training. The remainder represented the sales price of the equipment. Ultimately, the system only partially worked and the plaintiff sued for rescission of the contract and damages against Brown and the manufacturer of the computer and the programmers. Affirming the trial court's conclusion that the contract was a sale subject to redhibition, this court noted that the software and training charge, which constituted an obligation to do rather than to give or deliver, represented only 1/5 of the total cost of the system. The predominant obligation was to deliver the computer hardware and printers, which represented the major expense of the contract, and thus the contract as a whole was characterized as a sale.
The analysis utilized in Austin's of Monroe, Inc. to determine the predominant obligation in a contract having both elements of a contract "to give" (sale) and a contract "to do" (construction) was utilized in the very early case of Hunt v. Suares, 9 La. 434 (1836) and numerous subsequent cases. In Hunt, the agreement involved the installation of a marble mantel and chimney pieces. The court weighed the relative value of the marble versus the value of installation and found that the value of the marble was far greater than the installation and concluded that the transaction was a sale. However, as noted by Professor Litvinoff, "a different conclusion is reached [in cases] when the labor involved in installing equipment or furnishings is of greater importance than the things themselves." Saul Litvinoff, supra at p. 292.
In Calandro's Supermarket, Inc. v. Hussman Refrigeration, Inc., 525 So.2d 316 (La. App. 1st Cir.1988), the court reviewed a contract involving the installation of a commercial refrigeration system to determine whether the rules of sale and redhibition applied. Hussman Refrigeration, the manufacturer of the refrigerator, solicited Calandro's business for the sale of its twin system refrigeration units, which consisted of units with two compressors. Calandro's negotiated a purchase of the units and engaged the services of a licensed refrigeration mechanic to install the units. Neither the mechanic nor Calandro's knew how to install the units, so Hussman agreed to provide technical assistance and guidance in installing the system.
After numerous compressor failures that caused hundreds of pounds of meat spoilage, it was discovered that "weep holes" in the oil return line stub in the suction manifold were reversed. This was easily rectified by switching the starting sequence of the compressor motors. Testimony indicated that the "weep hole" reversal situation was caused by a welder's reversal of the location of the holes during the manufacturing process. The trial court found that the weep hole reversal was a technical defect in the product which constituted a redhibitory defect. The appellate court agreed and the special awards in redhibition of the return of the purchase price and attorney fees were upheld.
Before making a characterization of the contract between Jones and M & D, we also note from other jurisprudence involving clearly a contract of sale that the courts may determine that the breach of the agreement did not necessarily give rise to an action in *890 redhibition. In Victory Oil Company, Inc. v. Perret, 183 So.2d 360 (La.App. 4th Cir.1966), writ refused, 249 La. 65, 184 So.2d 735 (1966), the court emphasized that the action in redhibition is based upon a vice or defect in the thing sold, which renders it either absolutely useless, or its use is so imperfect, that it must be supposed that the buyer would not have purchased it. La.C.C. art. 2520. The object of sale in the case was a specific type of diesel oil, but the oil delivered was a different type unsuitable for use in the buyer's trucks. The court determined that an action based on the delivery and failure of the wrong commodity was not an action in redhibition, but one for breach of contract with the ten-year prescriptive period applicable.
In Peoples Water Service Co. of Louisiana v. Menge Pump and Machinery Co., Inc., 452 So.2d 752 (La.App. 5th Cir.1984), the seller, Menge, contracted to provide a specific type of pump to specifications different from the available "showroom floor" standard pumps available. The pumps provided were not of the type contracted for, i.e., fabricated to be non-corrosive. The pumps subsequently failed because, as in Victory, they were the wrong commodity and not because of a vice or defect in the thing itself. The court found that because the facts were more pointedly in line with Victory, the action was one for breach of contract and the ten-year prescription applied as to the defendant.
In Walker v. Universal Business Association, 482 So.2d 992 (La.App. 3d Cir.1986), the purchasers of a mobile home brought a redhibitory action against the seller and manufacturer of a mobile home which began to evidence severe defects shortly after its delivery. The mobile home was damaged during delivery when it became stuck in a ditch and was repeatedly twisted and bowed as the driver of the towing truck tried to pull the mobile home out of the ditch for five hours by repeatedly backing up and then going forward. Although no damage was visible, defects in the mobile home became evident within one week as an outside wall on the home developed a bulge, some of the metal sheets covering the home popped loose, the roof began to leak and walls and paneling buckled and came loose.
The court of appeal, unlike the trial court, found that the plaintiffs were not entitled to redhibition because the defects did not exist at the time the mobile home left the defendant's sales lot. The damage occurred between the defendant's sales lot and the plaintiffs' homesite. Noting that the seller breached its obligation under the Civil Code to deliver the object of sale in the same state in which it was at the time of the sale without any change caused by the act or fault of the seller, the court allowed the plaintiff to recover for breach of contract as well as damages in tort.
Indeed, the newly enacted articles 2524 and 2529 of Chapter 9 (Redhibition) of Title VII, Book III of the Louisiana Civil Code, which do not change existing law, were enacted to clarify the distinction in contracts of sale between the warranty against redhibitory defects and the obligation to deliver the thing of the kind and quality specified in the contract. A breach of this nature gives rise not to an action sounding in redhibition, but for breach of contract and is subject to the ten-year liberative prescription.
With these examples in the jurisprudence considered, we have reviewed the facts of these parties' dealings. In this instance, M & D had some control over the specifications of the gasoline system to be installed. Although Jones' submitted a drawing of the location of the tanks along with a proposal, it appears that M & D made a decision to change the direction of the placement of the tanks without Jones' approval, possibly to accommodate the installation of a parking lot drain. Negotiations regarding the anodes for the system, the services Jones' would provide, and the excavation work performed by another M & D subcontractor all took place before construction or installation began. The object of the contract was not just the tank, but the tank properly outfitted with cathodic protection and situated in a proper soil environment.
In addition to these negotiations by the parties regarding the work to be performed, it is significant in this case, when compared to the vendor in the Calandro's case, that *891 Jones was not the manufacturer of the tanks. Jones, while supplying the materials for the system, provided most essentially its knowledge and skill in bringing the components together.[3] In the critical area of installation of the anodes for cathodic protection, Jones supplied the skill, labor and expertise which converted the raw materials into an operable UST system with a cathodic protection system. Jones undertook the responsibility of supervising the entire installation.
In this job with its attendant environmental consequences, the relative value and importance of Jones' skill and expertise for the UST installation well exceeded the cost of the tanks themselves. M & D was not simply buying tanks that had to be hooked up to anodes in the same way one buys a refrigerator whose installation requires that it be hooked up to a water line. A very significant and serious factor underlying this agreement involved the potential for environmental liability, which in this case, unfortunately materialized. M & D, not knowing how to install such a system, relied on Jones' expertise.
Based upon these factors, we conclude that the predominant element of the agreement between Jones and M & D was to contract out Jones' skill and "know how" in supplying a UST system, not merely the sale of underground tanks and their components. We find, therefore, that the agreement between M & D and Jones is more properly characterized as a contract to build, and the ten-year liberative prescription for breach of contracts is applicable to this case.
We further observe that even had we found that the predominant elements of the agreement constituted a sale rather than a building contract, the record is significantly lacking in proof of the existence of a clear redhibitory defect in this case so that the principles discussed in Victory, supra and Walker, supra, and reflected in La.C.C. arts. 2524 and 2529 and their revision comments might be applicable in support of a ten-year prescriptive period for a general breach of contract. The burden of proof of a defect in the nature of a redhibitory vice was clearly on Jones in urging prescription in this disputed contractual setting. Spott v. Otis Elevator Co., 601 So.2d 1355 (La.1992).
Accordingly, defendant's first two assignments of error renewing its exception of prescription in this appeal are without merit.
Assignment of Error Number 3Future Remediation Damages
Jones contests the $182,400 award for costs of future remediation since the jury was apparently influenced by Mr. Fulton's proposal for four additional wells costing over $200,000. The present plan of remediation, as approved by the DEQ, is treating the underground water in a slower and arguably less effective manner. Nevertheless, the present annual cost of sampling and testing the water, reporting to the DEQ and operating the system is only $10,000, and the present system would take no longer than ten years to complete the filtration process.
Damage awards between private litigants for costs of remediation of environmental problems necessarily involve the consideration of the assessments and compliance orders of the DEQ, which is the primary state agency concerned with environmental protection and regulation. See, Matter of American Waste and Pollution Control Co., 93-3163 (La. 9/15/94), 642 So.2d 1258 and Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 452 So.2d 1152 (La.1984). The legislature has specifically addressed the environmental problems associated with leaking underground storage tanks and their remediation and has authorized the DEQ to promulgate UST regulations. La.R.S. 30:2194 et seq., LAC 33:XI. The DEQ's actions in protecting the public interest in the environment are governed by a rule of reasonableness which "requires a balancing process in which environmental costs and benefits must be given full and careful consideration along with economic, social and other factors." Save Ourselves, 452 So.2d at 1157. "In some instances environmental costs may outweigh economic and social benefits and in other instances they *892 may not. This leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances." Id.
The DEQ's exercise of its role as the public trustee for the protection of the environment results in the development and imposition of a remediation plan which determines in large part the measure of damages for the environmental liability affecting a particular property. Apart from this imposed liability as a broad remedy for the public's protection, the actual damages for the private litigants involved in the controversy might not be the same under the conventional measure of damages. La.C.C. art. 1995; e.g., see Mouton v. State, 525 So.2d 1136 (La.App. 1st Cir.1988), where the court stated that "if the land has been rendered useless and the cost of restoration exceeds the value of the land (and no residual value has been proven), the owner of the damaged land is entitled to recover only the market value of the land in damages." In the case of a large commercial establishment with no need or utilization of the underground or surface water and no threat of migration of the contaminant to adjoining properties, the ability to use the property for economic gain could be unaffected and the contamination remain literally buried but for the environmental liability assessed by the DEQ for the broader public interest.
In Magnolia Coal Terminal v. Phillips Oil Company, 576 So.2d 475 (La.1991), the supreme court struggled with the issues of remediation, the measure of damages, and the administrative agency's role in a mammoth environmental disaster litigated between private parties. The case dealt with an oil and gas well which had blown out years earlier but which was determined by the court to still be leaking. In a ruling with four concurring opinions and one dissent, the role of the administrative agency (in that case the Office of Conservation) and the correct assessment of past and future damages were the subject of much discussion. The divergence of views emanated from the central problem summed up in one statement in the main opinion:
"Not only the soil but the ground-water, the Mississippi River and the public have been damaged." (Emphasis supplied)
Id. at 484. When "the public" is damaged or the environment threatened, the "responsible exercise of discretion" by the administrative agency, which was missing in Magnolia Coal Terminal, is essential in measuring the damage for the adjudication of the contribution or indemnity rights between private litigants responsible in whole or in part for the problem.
In this case, following a two-year assessment of the underground contamination and negotiations for a plan of remediation by the DEQ and M & D, the well pattern and water filtration system were approved and implemented by 1992. At trial four years later, the local representative of the DEQ, Mr. Thomas Scott, discussed his involvement with the plan of remediation since 1992. In response to plaintiff's inquiry, Mr. Scott affirmed that he was satisfied with the progress of the remediation made through the time of trial. Testimony also revealed that in response to DEQ's directives immediately prior to trial for additional sampling of other areas surrounding the tank site, CK Associates had demonstrated to the DEQ's satisfaction that the underground contamination plume had not spread. In questioning Mr. Scott, the plaintiff posed no question regarding the potential for significant modification by the DEQ to the existing system for remediation. Mr. Fulton's proposal for four new wells was not discussed with Mr. Scott. When Mr. Fulton was questioned about the existing plan of remediation he described the system as "very effective remediation." The plume had apparently contracted and had never spread beyond M & D's property to threaten nearby surface water or groundwater. Mr. Fulton likewise affirmed that the remediation had been performed in full compliance with the UST regulations of the DEQ and that to his knowledge DEQ was satisfied with the system in place.
From this testimony regarding the DEQ's sanctioning of the existing remediation and its effectiveness, we believe the award of the jury based upon Mr. Fulton's proposal to add more wells is clearly wrong.
*893 While Mr. Fulton's proposal would no doubt complete the remediation of the environmental damage in less time than the existing system, it is the prerogative of the DEQ to weigh the environmental costs and benefits against the economic cost of the competing pump and treat systems at issue. The DEQ has made that choice, remediation is effectively occurring and no significant potential for costly modification by the DEQ to the present system was attempted to be proven at trial. Accordingly, based upon our review of the record and the annual costs of compliance which have occurred and can be expected for the next ten years, we lower the award for future remediation costs to $100,000. In setting this award, we have not discounted the expected annual costs in an effort to allow for any unexpected modifications to the system or equipment replacement over the remainder of the remediation period.

Assignment of Error Number 4Legal Interest
By this assignment, defendant argues that the interest on any award for future damages should apply only from the date of judgment. In general, interest for damages for breach of contract to pay money runs from the date the contract amount is due, and where the breach is for a nonmonetary obligation, from the date of judicial demand. See Alexander v. Burroughs Corp., 359 So.2d 607 (La.1978). In the case of Mini Togs Products, Inc. v. Wallace, 513 So.2d 867 (La. App. 2d Cir.1987), writ denied, 515 So.2d 447, 451 (La.1987), plaintiff filed suit for the faulty construction of a building and for the cost of repairing the defects in the building. The trial court awarded damages to remedy the defects, including in the amount profits and engineering fees. Regarding the award of interest on the judgment awarded, the court stated, in pertinent part, as follows:
Although the issue as presented to us in this case is whether legal interest should run from date of judicial demand or from date of judgment, neither of those dates are specifically mentioned in the codal articles providing for legal interest on debts or claims arising out of contracts.
Cases involving disputes over the time of commencement of legal interest have often been resolved by reference to the time the debt was due, or when the obligor was put in default, or when the claim became liquidated or ascertainable. Often the dispute has been whether legal interest commenced to accrue upon judicial demand or at an earlier date.
The most recent decision of the Louisiana Supreme Court dealing with legal interest on a claim arising out of a contractual relationship is Alexander v. Burroughs Corporation, 359 So.2d 607 (La.1978).... We read the decision in that case as holding that a claim arising out of a contract, whether liquidated or not, bears legal interest from judicial demand or from such earlier date when the claim became ascertainable and due.
* * * * * *
In using the term "ascertainable" the court did not mean that the precise amount of the claim need be liquidated or established without dispute in order for legal interest to commence in a contract claim.... What was meant was that a debt or claim for the payment of money or damages under a contract is ascertainable and becomes due on the date an active violation occurred or the obligor was put in default, which can be earlier but never later than judicial demand, and legal interest runs from that date.
Similarly, the Supreme Court, in Trans-Global Alloy Ltd. v. First National Bank of Jefferson Parish, 583 So.2d 443 (La.1991), held that interest should run from the date of judicial demand on a judgment in a breach of fiduciary duty and wrongful misrepresentation case, overturning the trial court's award of interest from the date of judgment because the damages were not ascertainable until that time. The court reasoned that interest is due from the date of judicial demand at the latest because the defendant had had the use of the plaintiff's money. Under civil law doctrine, of course, rent for the use of money is interest.
In this case, the damages which M & D incurred are, as discussed above, related *894 primarily to the 1992 plan of remediation imposed by the DEQ. Those damages were owed, in the words of Trans-Global Alloy Ltd., "irrespective of the ascertainability of the damages as of the date of filing" of this suit. Id. at 459. From our review of this jurisprudence, the fact that a portion of the costs which M & D must expend may only arise in the future does not mandate that the award for legal interest in this breach of contract case be assessed only from the date of judgment or some future date. Though a defendant might dispute at trial the appropriate measure of the award for damages based upon a discounting of costs to accrue in the future, the award for legal interest under the jurisprudence can be assessed from the date of judicial demand. We therefore reject Jones' assignment of error regarding the award for legal interest from date of judicial demand.

Assignment of Error Number 5Citizen Suits Remedies
By this assignment, Jones contends that this case is not appropriate for an award of attorney fees because the "citizen suits" provision of the Louisiana Environmental Quality Act ("Act") is not a cause of action of which M & D may avail itself in this instance. We agree.
The citizen suits provision of the Act, La. R.S. 30:2026 states:
§ 2026. Citizen suits
A. (1) Except as provided in Subsection B of this Section, any person having an interest, which is or may be adversely affected, may commence a civil action on his own behalf against any person whom he alleges to be in violation of this Subtitle or of the regulations promulgated hereunder. The action must be brought either in the district court in the parish in which the violation or alleged violation occurs or in the district court of the domicile of the alleged violator, and shall be afforded preferential hearing by the court.
(2) If, at the hearing on the order, it appears to the satisfaction of the court that a violation has occurred, or is occurring, the court may, in order to enforce the provisions of this Subtitle, assess a civil penalty not to exceed ten thousand dollars for each day of the continued noncompliance and the court may, if appropriate, issue a temporary or permanent injunction.
(3) The court in issuing any final order in any action brought pursuant to this Section, may award costs of court including reasonable attorneys and expert witness fees to the prevailing party. The court may also award actual damages to the prevailing plaintiff. The judgment of the court at the hearing, or subsequently on a petition for fixing the penalty if the violation is a continuing one, shall fix the total amount of penalty due, which shall be collectible under the same procedures as now fixed by law for the collection of money judgments and shall be awarded to and collected by the state of Louisiana and deposited into the state treasury.
This legislatively authorized participation of the public in environmental disputes is aimed at achieving two goals, public input in substantive environmental matters and a safeguard against abuses in the administrative process. Matter of American Waste and Pollution Control Co., supra. It is clear that the purpose of this portion of the act is to encourage citizens or citizen groups to seek judicial enforcement of the DEQ regulations where the DEQ has failed to act or where the sufficiency of the actions in protecting the public can be questioned. The principal party defendant in such action would be M & D, the owner and operator of the contaminated site.
This rationale is supported by the specific language relating to attorney fees in paragraph A.(3) of La.R.S. 30:2026 which indicates that only "in issuing any final order [as opposed to a judgment for damages] in any action brought pursuant to this Section," may the court award reasonable attorney and expert witness fees to the prevailing party. In this action, the court did not issue any order pursuant to the Act because M & D was already acting in conformity with the Act.[4] Thus, M & D is in the *895 anomalous position of arguing for contractual damages based upon the cost of its compliance with the Act while making a citizen suits claim alleging "continued noncompliance" with the Act. M & D, by following the DEQ directives from the time the leak was discovered, may not claim that it or Jones is in violation of the Act, justifying the citizen suits remedies. See Mayor and Council of Morgan City v. Ascension Parish Police Jury, 506 So.2d 773 (La.App. 1st Cir.1987), where the court held that the plaintiffs were not entitled to recover attorney fees under La.R.S. 30:1074, a provision virtually identical to La.R.S. 30:2026, where the plaintiffs had not obtained a final order from a court recognizing a violation of the Act.
Moreover, we note that Professor Murchison has characterized the citizen suits provision of the Act as arguably creating a new tort. K. Murchison, "Enforcing Environmental Standards Under State Law: The Louisiana Environmental Quality Act," 57 La.L.Rev. 497, 555 (1997). Thus, despite M & D's remedies under its contract which we have recognized herein as not having prescribed, the citizen suits claim which M & D asserts would have prescribed under the one-year prescription applicable to torts.
Accordingly, the remedies for attorney fees, which are not available to a prevailing party in contract absent an express contractual provision, are inappropriate in this case. The judgment for $121,829.32 in attorney fees is, therefore, reversed.
On the other hand, costs of the clerk and sheriff, witness' fees and costs of taking depositions used at trial may be assessed under La.R.S. 13:4533. See also La.R.S. 13:3666. The trial court awarded $1339.77 in court costs, $280.89 in expenses related to the deposition of Mr. Holliday used at trial. We affirm these costs. Additionally, the court awarded expert witness fees and expenses for Gary Fulton and Kevin Garrity, fixing the fee at $2,500 each, and expenses at $449.14 and $1,000 respectively, coming to a total of $6,449.14. However, inasmuch as Gary Fulton testified regarding the cost and implementation of CK Enterprises' accelerated remediation plan, a plan unapproved by DEQ and which this court, therefore, rejected, we reverse the award for his expert witness fee and expenses in the amount of $2,949.14. The fee and expenses for Kevin Garrity are affirmed.

M & D's Answer to the Appeal
M & D filed an answer to the appeal requesting an additional $3,103.15 in deposition costs. These deposition expenses were originally prayed for in M & D's Motion to Fix costs and were apparently rejected by the trial court because the depositions were discovery depositions.
On appeal M & D answers that all deposition costs are due as part of the attorney fee award under La.R.S. 30:2026(A)(3) as out of pocket expenses or litigation expenses. However, because we reverse the attorney fee award under the citizen suits provision of the Act, these arguments are now moot. Additionally, however, M & D submits that "costs" under La.R.S. 13:4533 should include all costs associated with trial, including "expert witness fees, deposition costs, exhibit costs and related expenses," citing Murphy v. Boeing Petroleum Services, 600 So.2d 823, 828 (La.App. 3d Cir.1992). In Murphy, the trial judge awarded deposition expenses after it found that most of these expenses were incurred in connection with attempts by Boeing to mitigate the damages rather than trial preparation. In fact the case never went to trial.
La.R.S. 13:4533 states:
The costs of the clerk, sheriff, witness' fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs.
A trial court may not award cost for depositions not "used on the trial." Boutte v. Nissan Motor Corp., 94-1470 (La.App. 3d Cir. 9/13/95), 663 So.2d 154. If a deposition is not used at trial, the cost of that deposition, including deponent's fee for giving the deposition, may not be taxed as costs. Moran *896 v. Harris, 93-2227 (La.App. 1st Cir. 11/10/94), 645 So.2d 1248. The general rule is that only depositions which are used at the trial are taxable as costs. Doug Ashy Lumber, Inc. v. Ducharme, 185 So.2d 848 (La. App. 3d Cir.1966). We conclude then, that the trial court did not abuse it discretion in refusing to include these deposition expenses as costs.

Conclusion
Accordingly, for the foregoing reasons, we render judgment affirming in part the trial court's judgment in favor of M & D and against Jones for breach of the contract to furnish and supervise the installation of the underground gasoline storage system and the award of $142,000 for damages. We amend the judgment for future damages lowering the award to $100,000. We reverse that part of the judgment awarding attorney fees and reduce the award for expert witness fees by $2,949.14 to $3,500.00. Costs of this appeal are assessed against Jones.
AFFIRMED IN PART, AMENDED IN PART, REVERSED IN PART AND RENDERED.
NOTES
[1] Cathodic protection refers to a corrosion prevention system consisting of devices called "anodes" composed of magnesium that are connected to the tank by wires running from the anodes and attached to the tank by a special weld known as a cad-weld. Properly sized anodes of sufficient number provide electrical protection to the tanks that prevents the tanks from corroding.
[2] The Civil Code articles on redhibition were amended by 1993 Act No. 841 § 1. Because the applicable new articles did not change the law, we will reference the new articles along with the corresponding previous articles where appropriate.
[3] From our review of the invoice issued to Jones from the manufacturer of the tanks, Jones made little profit over the cost of the tanks and thus realized its main economic gain from this contract from its services.
[4] In the questioning of the DEQ's representative, Mr. Thomas Scott, plaintiff asked:

Q. During the period since this plan was put into effect and begun, has the agency had any reason to file a compliance order, or any kind of notice ... to M & D that they were not acting according to the agency's desire?
A. No.