MOORE, J.
hThe seller, Hollenshead Oil & Gas LLC, appeals a judgment awarding damages of only $35,500 instead of $257,000, and attorney fees of only $25,000 instead of $113,000, for an alleged breach of contract. The buyer, Gemini Explorations Inc., answers the appeal, contesting the award of attorney fees. We amend to correct the award of legal interest but otherwise affirm.

Factual Background

The seller is a limited liability company whose principal is David P. Hollenshead; references to “David” in this opinion will be to the man and “Hollenshead” to the company. The buyer, Gemini, is a corporation owned by Gene DuCharme and Frank Vozzella. All three men are experienced in the oil and gas business.
In October 2005, DuCharme learned that Hollenshead was looking to sell its oil production interests in Northwest Louisiana, including some 500 wells on 60 leases in the Pine Island area. Hollenshead was asking $6 million for the deal. During 60 days of due diligence prior to the sale, DuCharme and Vozzella calculated that the field was worth about $8.5 million, so they agreed to buy at the asking price. On December 22, 2005, they executed an “Act of Sale of Oil and Gas Working Interests, Equipment and Oilfield Yard” for a base price of $5.7 million plus a seller’s commission of $300,000.
The final element of the price — where the instant dispute arose — was payment for the production in tanks. Under § 6.1 of the contract, the parties were to “gauge and measure the oil, gas, and mineral production contained pin all tanks associated with the leases.” Then they were to “jointly determine and record * * * the volume of oil contained in each such tank, without any deduction for water or other contaminate in such tank.” Finally, the seller agreed to sell and buyer “to purchase the volume measured.” Section 6.2 tied the price to the daily prevailing posted price for Northwest Louisiana Crude for December 2005.
Pursuant to this contract, DuCharme met David and his manager, Dwayne Au-try, at the site the next morning to gauge 144 tanks on the leases. Autry climbed atop each tank, dropped a plumb line to measure the liquid, and called his reading *812 down to David who manually recorded it as DuCharme watched. Linear depth was then converted to volume in barrels using a formula based on the dimensions of the given tank. According to David, these measurements showed over 4,454 barrels in the 93 production tanks and 1,020 barrels in the gun barrel tanks. Using the price stated in § 6.2, David ultimately contended he was due over $250,000 for this production.
Gemini took possession of the leases immediately after they finished gauging on December 23. Based on production history, these leases usually yielded 4,800 to 5,500 barrels per month. To DuCharme’s surprise, however, for the first several days the gauges showed no production from any of the 60 leases, and after a week’s time, a handful had shown only a few inches’ worth. He then began opening some production tanks and discovered that most of them were filled with saltwater, sand and other unsalable components which comprise 98% of raw production and are | ¡¡segregated from raw production in a gun barrel tank. DuCharme theorized that David had “flushed” the contents of the gun barrel tanks into the production tanks shortly before December 23 to create the false appearance that they contained a lot of oil.
On further research, Gemini discovered that less than a week before December 23, Hollenshead had sold virtually all the “merchantable crude oil,” some 2,800 barrels, from its production tanks to another buyer, Genesis Oil Co. This confirmed Gemini’s suspicion that on December 23, there was virtually no merchantable crude in any of the production tanks, only a saltwater flush from the gun barrels. When the production payment fell due on February 28, 2006, Gemini did not pay.

Procedural History and Trial Testimony

Hollenshead filed this suit in July 2006 seeking from Gemini $257,007.24 for the production payment,[1] an attorney fee, “delay damages” from February 28, and legal interest from date of judicial demand. Hollenshead later amended its petition to add DuCharme and Vozzella as solidary obligors with Gemini.
Gemini answered, denying any liability for the reasons summarized above. Gemini also reconvened, seeking damages for the improper flushing of gun barrels into the production tanks.
The matter went to a four-day trial in January and February 2009. As background information, all witnesses established that in the Pine Island area, raw production from underground is pumped into a “gun barrel” or 14separator tank, in which gravity separates oil from water and solids, such as sand (often called base sediment and water or “BS & W”). The oil, which comprises only about 1% of raw production, floats to the top. When a sufficient amount of “good oil” has accumulated, it is drained into a storage or “production” tank to await sale. Buyers require that the contents of production tanks be about 98% good oil, with only minimal saltwater, sand and other contaminants. To avoid getting these contaminants, buyers will drain a production tank only down to the “gauge line,” usually 16 inches from the bottom of the tank. The sludge, called “back gauge,” that remains under the gauge line contains oil but is not generally considered salable. The raw, highly contaminated contents of the gun barrel tank are never considered salable.
*813 David testified that pursuant to § 6.1, he sold all the oil they measured in all the tanks on December 23, but Gemini never paid him for it. He admitted they did not test the contents while gauging the tanks, but DuCharme raised no objections and agreed to all measurements. He also admitted that an oil company like Genesis (to whom he sold much of his production days before closing the sale with Gemini) did not buy gun barrel fluid, but he maintained that there was plenty of good oil in the production tanks when Gemini took possession.
Hollenshead’s manager, Autry, testified that in December 2005 David asked him to “get the oil ready” for Gemini; he gave a long (and often digressive) account of his methods of servicing gun barrels and production tanks. He admitted that shortly before the sale to Gemini, he “pushed” or 1 ¡/‘flushed” the gun barrels into the production tanks, at David’s request, but he explained that this was a normal procedure.
DuCharme testified that at the closing, David asked if he objected to letting Hol-lenshead flush the gun barrels before the sale, and to paying him for back gauge; DuCharme replied, “No way.” Even though he read § 6.1, he knew that nobody in the industry paid for back gauge and saltwater, so he felt the contract was all right. He also admitted that after he serviced several production tanks, they began to produce merchantable crude.
Vozzella also testified that at the closing, Hollenshead’s attorney told him that they would like to include back gauges and gun barrels as part of the sale, but he (Vozzel-la) replied, “Absolutely not.” He also said he understood § 6.1 to mean there would be no deduction for the normal contamination in production tanks, but not for saltwater flushed straight from a gun barrel. Nevertheless, by his reckoning (and that of their CPA, Thomas Youngblood, who also testified), Gemini extracted 812 barrels of “good oil” present in the production tanks on December 28, and for this Gemini owed Hollenshead $35,556.
Hollenshead’s attorney, Steve Yancey, testified that a partner of his, Bill Kalm-bach, drafted the contract. He did not recall discussing back gauges and gun barrels at the closing.

Action of the District Court

By written ruling, the court noted that § 6.1 was the focus of the trial, and that if this was ambiguous, it had to be construed against Hollenshead, whose counsel had drafted the contract. The court found that § 6.1 “could Ifihave included more precise language regarding ‘all tanks,’ ” in light of the industry practice not to sell gun barrel and back gauge; the court therefore construed it to mean all merchantable oil. The court also noted that both of Gemini’s principals were adamant that Hollens-head’s attorney broached the subject of selling them gun barrel and back gauge, and they refused; by contrast, the attorney was merely “unclear” about any such discussion. This fortified the court’s conclusion that the parties really meant to sell only merchantable oil. The court recognized that Hollenshead had every right to sell its stock to Genesis days before the deal with Gemini, but Gemini was bound to pay only for merchantable oil. The court accepted Vozzella’s calculation that only 812 barrels of good oil were in the production tanks on December 23, and for this the court awarded $35,500.
After receiving the reasons for judgment, Hollenshead filed a motion for attorney fees. In support, it cited the contract, § 8.5: “Purchaser agrees to pay all Seller’s fees, experts fees, and expenses incurred by the Seller in enforcing any of the obligations of the Purchaser under this Act.” It attached an affidavit of lead coun *814 sel, listing attorney fees, paralegal fees and assorted costs totaling $113,200.01.
Gemini responded that § 8.5 did not specifically provide for attorney fees, the court rejected virtually all of Hollenshead’s claims, Gemini offered to settle the case, the litigation was vexatious, and the fees claimed were exorbitant.
After a two-day hearing, the court found that § 8.5 did indeed encompass an award of attorney fees, and rejected Gemini’s contention that |7HolIenshead pursued “vexatious” litigation. However, the court also found that Gemini’s counsel had made a genuine offer to settle the matter for $25,236 in early March 2006, with absolutely no response. The court found that a fair award would be $25,000, roughly 70% of the principal judgment.
After judgment to this effect was rendered, Hollenshead took the instant appeal, raising five assignments of error. Gemini answered the appeal.

Production in All Tanks: The Parties’ Contentions

By its first assignment of error, Hol-lenshead urges the court was incorrect, as a matter of law, in refusing to follow the clear language of the contract. It contends that § 6.1 plainly refers to the production “in all tanks associated with the leases” and “without any deduction for water or other contaminate in such tank.” It argues that these terms are clear and explicit: under La. C.C. art. 2046, they require no further interpretation. It suggests that the court redefined the agreement in an impermissible effort to reach a more equitable result for Gemini. Cashio v. Shoriak, 481 So.2d 1013 (La.1986). Further, the parties are presumed to read their agreements and will be held to them, especially when both sides are experienced businessmen in the field. Moseley v. Mustin, 38,455 (La.App. 2 Cir. 7/28/04), 880 So.2d 105. It cites two other provisions of the contract: § 4.1, disclaimer of merchantability, and § 4.2, acknowledgment that the buyer is familiar with the conditions of the lease, in support of the plain reading of § 6.1.
By its second assignment, Hollenshead urges the court erroneously utilized parol and extrinsic evidence to undermine and modify the |Ragreement of the parties. Hollenshead criticizes the court’s reliance on “an alleged hallway conversation” to vary the terms of the contract which were not ambiguous. Further, contrary to the court’s finding, Steve Yancey did not draft the contract; Bill Kalmbach did. It reiterates that Gemini’s principals reviewed the contract and had some concerns about the back gauge and gun barrels, but signed the deal anyway; they should be held to it.
By its third assignment, Hollenshead urges that even if the contract is ambiguous, the court was manifestly erroneous in substituting and exchanging its own definitions for the terms thereof and modifying it contrary to the expressed intent of the parties. In essence, Hollenshead contends that even if Vozzella’s methodology was correct, the documents establish that Gemini owes for 3,194 barrels in production tanks, or $141,809.18.
Gemini responds that the court properly interpreted the contract. It argues not that the contract is ambiguous, but rather that a literal reading would lead to absurd consequences — viz., the sale of un-merchantable oil, a result which, according to all witnesses, never occurs in the industry. Under La. C.C. art. 2053, the court was required to reform the contract “in light of the nature of the contract, equity, usages, [and] the conduct of the parties[.]” McDuffie v. Riverwood Int’l Corp., 27,292 (La.App. 2 Cir. 8/23/95), 660 So.2d 158. Gemini also submits that in *815 this long and complex record, the court was not plainly wrong to find (1) Gemini did not intend or agree to buy gun barrel fluid, (2) Gemini did not agree to buy oil located below the back gauges, and (3) the contract does not include the sale of BS & W. |i|Gemini also shows that even if the court was wrong to find that Steve Yancey drafted the contract, Hollenshead conceded in brief that another of its attorneys, Kalmbach, actually did so; either way, the dubious provision is to be construed against Hollenshead. La. C.C. art. 2056. Gemini contends that Hollenshead did not properly object to the parol and extrinsic evidence now contested on appeal; hence, the objection is waived. La. C.E. art. 103 A(1); Osborne v. McKenzie, 43,658 (La.App. 2 Cir. 10/22/08), 998 So.2d 137, unit denied, 2008-2555 (La.1/9/09), 998 So.2d 726.
Finally, Gemini urges that the award of $35,500 was fully supported by the record. Specifically, (1) Hollenshead sold most of its production shortly before the sale to Gemini, (2) Hollenshead’s gauge sheets proved that the seller flushed gun barrels into the production tanks, (3) Gemini never sold any of Hollenshead’s oil (if so, the field would have produced 10,000 barrels between December 23 and January 31, which is obviously impossible), and (4) Voz-zella accurately calculated the merchantable oil in the tanks at the time of the sale.

Applicable Law

In interpreting contracts, courts are guided by the general rules stated in La. C.C. arts. 2045-2057. The cardinal rule is that the interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045; Amend v. McCabe, 95-0316 (La.12/1/95), 664 So.2d 1183. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046. The letter of the clause should not be | indisregarded under the pretext of pursuing its spirit. La. C.C. art. 2046, comment (b); Cashio v. Shoriak, supra.
The words of a contract must be given their generally prevailing meaning; however, words of art and technical terms must be given their technical meaning when the contract involves a technical matter. La. C.C. art. 2047; Amend v. McCabe, supra; McDuffie v. Riverwood Int'l, supra. If a word is susceptible to different meanings, it must be interpreted as having the meaning that best conforms to the object of the contract. La. C.C. art. 2048. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. C.C. art. 2053; Campbell v. Melton, 2001-2578 (La.5/14/02), 817 So.2d 69.
Factual findings which are pertinent to the interpretation of a contract will not be disturbed absent manifest error. Campbell v. Melton, supra; Newman Marchive Partnership Inc. v. City of Shreveport, 40,512 (La.App. 2 Cir. 2/24/06), 923 So.2d 852, unit denied, 2006-1040 (La.6/23/06), 930 So.2d 983.

Discussion

Hollenshead ably shows that a plain reading of § 6.1, referring to “the volume of oil contained in each such tank, without any deduction for water or other contaminate in such tank” and obligating Gemini to “purchase thej^ volume measured,” would mandate payment for every barrel measured on December 23. How *816 ever, the testimony was unanimous that in Northwest Louisiana’s oil and gas trade, buyers will not buy, and sellers do not sell, material that is predominantly gun barrel fluid, saltwater, BS & W or back gauge— contrary to the result suggested by the plain reading of § 6.1. Witnesses agreed that a normal amount of contamination was acceptable, but not the raw production stored in gun barrels. The court was entitled to find that clearer terms were needed to refute the industry practice. With this practice established, the court did not err in accepting parol evidence showing that Gemini’s principals attempted to discuss the matter, and that Hollenshead’s attorney did not recall the discussions. Moreover, § 6.2 fixed the price at the benchmark Northwest Louisiana Crude for December 2005; to apply this to valueless contaminants would result in an anomaly.
On this record, the district court was fully entitled to interpret the contract as stating an intent to convey merchantable oil. In this reading, the “no deduction” provision applies to normal levels of contaminants, not to over 5,000 barrels of mainly gun barrel. This reading comports with the technical meaning of terms, serves the equity and usages in the industry, and gives effect to the contract as a whole. We perceive no manifest error.
We have also considered Hollens-head’s alternative argument that even if the district court’s reading of the contract is not legally wrong, its application of the facts was manifestly erroneous. Hollens-head urges that Gemini received 3,194 barrels of “good oil” instead of the 812 barrels for which judgment was rendered. Gemini counters that because Hollenshead |iasold most of its merchantable oil in mid-December and then flushed the gun barrels into the production tanks, there could not have been over 3,000 barrels of “good oil” on hand, and according to its calculations, they contained only 812 barrels.
This court will not belabor the substantial record. The run tickets confirm that Hollenshead sold Genesis about 2,800 barrels of “good oil” on December 18 and 19, days before the sale to Gemini. Hollens-head initially claimed that it sold 5,474 barrels to Gemini on December 23, which would mean the wells produced 8,274 barrels in the first three weeks of December, a yield unrealistically higher than the 5,000-barrel monthly average. Hollens-head’s revised claim that it sold Gemini 3,194 barrels would mean that the wells produced nearly 6,000 barrels in the same time frame, still noticeable higher than the average. By contrast, Vozzella parsed the gauge sheets after December 23 and calculated that Gemini received 812 barrels. Added to the 2,800 already told to Genesis, this would come to 3,612 for the first three weeks of December, well within the normal range of 4,500 to 5,200 for a full month. The district court was impressed with Voz-zella’s candor, which shows even on the impassive record. The court neither abused its discretion nor committed manifest error in accepting his calculation and awarding $35,500. These assignments of error lack merit.

Attorney Fees and Interest

By its fourth assignment of error, Hol-lenshead urges the court erred in awarding an abusively low attorney fee and in failing to award expenses and delay damages. Of the $25,000 awarded, uncontra-dicted litigation expenses 113totaled $11,216.51, leaving (in Hollenshead’s view) an unconscionably low balance of $13,783.49 for three attorneys whose fees were reasonable and whose worth furthered their client’s interest. It requests attorney fees of $101,983.50, an additional fee for handling the appeal, and expenses of $11,216.51. Finally, it requests “delay *817 damages” under La. C.C. art. 2000, based on the legal interest rate from February 28, 2006, until paid.
By answer to appeal, Gemini urges the court erred in awarding any attorney fees. It shows that § 8.5 refers to “all Seller’s fees,” and without an explicit mention of attorney fees, they cannot be awarded. Maloney v. Oak Builders Inc., 256 La. 85, 235 So.2d 386 (1970). It also cites La. C.C. art. 2003, “An obligee may not recover damages when his own bad faith has caused the obligor’s failure to perform,” and argues that Hollenshead’s conduct in this case, while perhaps not fraudulent, was in bad faith. In the alternative, it argues that Hollenshead is entitled only to a reasonable attorney fee. Central Progressive Bank v. Bradley, 502 So.2d 1017 (La.1987). Finally, Gemini argues that as for “delay damages,” Hollenshead never stated the specific amount due, and offered no evidence in support, so the court was not wrong to deny this particular claim.
 Attorney fees are not allowed except where authorized by contract or statute. State v. Wagner, 2010-0050 (La.5/28/10), 38 So.3d 240; State v. Williamson, 597 So.2d 439 (La.1992). Attorney fees are not allowable in an action for breach of contract unless there is a specific provision therefor in the contract. Maloney v. Oak Builders Inc., supra; Morris & Dickson Co. v. Jones Brothers Co., 29,379 (La.App. 2 Cir. 4/11/97), 691 So.2d 882, writ denied, 97-1259 (La.9/5/97), 700 So.2d 509.
In its written ruling, the district court candidly admitted that § 8.5, “authored by one of the plaintiffs attorneys, is indeed debatable as to whether it reasonably incorporates attorneys’ fees as ‘fees, expert fees and expenses.’ ” Although the court offered no explanation for its finding that the dubious clause indeed included attorney fees, this reading is within the court’s discretion, given the general aura of ambiguity already noted elsewhere in the act of sale, and the conduct of the parties after it was executed. On this record, we must defer to the court’s discretion and find no merit in Gemini’s answer to appeal.[2]
Courts may inquire as to the reasonableness of attorney fees as part of their prevailing, inherent authority to regulate the practice of law. State v. Williamson, supra; State v. McKeithen, 42,-830 (La.App. 2 Cir. 2/20/08), 976 So.2d 832, writ denied, 2008-0636, -0718 (La.5/16/08), 980 So.2d 709, 712. Factors to consider include: (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and (10) the court’s own knowledge. Id.
11fiThe district court aptly noted that for a judgment of $35,500, the claimed attorney fee of $113,200 was patently unreasonable. It also noted the letter of March 9, 2006, in which Gemini’s counsel acknowledged that Gemini owed $25,236.50. The *818 court construed this as an invitation to negotiate which Hollenshead ignored, with the result that plaintiffs counsel filed this suit and performed much work that was “unnecessary and excessive under the circumstances.” We find no manifest error in the court’s analysis of the standard factors for a reasonable attorney fee. The award will be affirmed.
Hollenshead next requests an additional attorney fee for handling this appeal. Ordinarily, a plaintiff who is entitled to an attorney fee by statute or contract, and who actually receives one at trial, is entitled to an additional attorney fee for defending the defendant’s unsuccessful appeal. Frith v. Riverwood Inc., 2004-1086 (La.1/19/05), 892 So.2d 7. Such a plaintiff, however, is not entitled to an additional attorney fee for pursuing his own, unsuccessful appeal. Royals v. Town of Richwood, 42,585 (La.App. 2 Cir. 10/24/07), 968 So.2d 833, 227 Ed. Law Rep. 457, writ denied, 2007-2447 (La.2/15/08), 976 So.2d 183. As Hollenshead’s appeal has resulted in no substantive relief, additional attorney fees are denied.
Hollenshead finally requests “delay damages,” which it describes as “an amount equal to the legal interest rate from February 28, 2006 to date, on any award in favor of Hollenshead.” When the object of the performance is a sum of money, damages for delay in performance are measured by interest on that sum from the time it is due, at the rate agreed by the parties lir,or, in the absence of agreement, at the rate of legal interest. La. C.C. art. 2000. The contract, § 6.2, called for payment of production in tanks “in no event later than February 28, 2006.” The judgment, however, awarded legal interest only from date of judicial demand, July 10, 2006. The judgment will therefore be amended to award legal interest from the contractual due date, February 28, 2006, until paid.

Conclusion

By its fifth assignment of error, Hollenshead urges the court erred in denying its motion for summary judgment. Gemini correctly shows, however, that a party cannot contest the denial of a motion for summary judgment on appeal, after a judgment on the merits. Hopkins v. American Cyanamid Co., 95-1088 (La.1/16/96), 666 So.2d 615; Pamplin v. Bossier Parish Community College, 38,533 (La.App. 2 Cir. 7/14/04), 878 So.2d 889, writ denied, 2004-2310 (La.1/14/05), 889 So.2d 266. This assignment lacks merit.
For the reasons expressed, the judgment is affirmed insofar as it ordered Gemini to pay Hollenshead $35,500 for production in tanks and $25,000 for an attorney fee. The judgment is amended only to award legal interest from the date of February 28, 2006, until paid. Any outstanding appellate costs are to be paid by the appellant, Hollenshead Oil & Gas LLC.
AMENDED AND AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, PEATROSS, DREW & MOORE, JJ.
Rehearing denied.

. In a motion for summary judgment, Hol-lenshead alleged the amount due was $256,409.47. The court denied the summary judgment.

. Although not cited by the parties, this court is aware of the older decisions in Lejeune v. Redd, 478 So.2d 717 (La.App. 3 Cir.), writ not cons., 480 So.2d 737 (1985), and Mahfouz v. Davidson, 422 So.2d 644 (La.App. 3 Cir.1982), holding that a contractual provision to pay a real estate agent's “commission and all fees and costs incurred in enforcing collection and damages" did not include attorney fees. Despite the clauses in those cases nearly identical to § 8.5, we deem them limited to the standard-form residential real estate agency agreements at issue therein and not controlling in the instant commercial sale of oil and gas working interests and equipment.