MOORE, J.
| j Clearview Investments Ltd. appeals a judgment ordering it to pay Transpetco I Joint Venture, a joint venture of which Clearview was a member, $248,900 to restore Clearview’s negative capital account balance with the joint venture. Clearview contends that Transpetco’s accounting is wrong in that it illegally allocated 100% of its leasehold costs to Clearview’s predecessor in title in 1992; using the proper allocation of 62.5%, Clearview contends it had a positive capital account and Transpetco actually owes it $276,000. Transpetco answers the appeal, seeking additional attorney fees for the appeal. We affirm the judgment and award additional attorney fees.

*51
Factual Background

In the 1970s, Shreveport oilmen Wallace Stanberry, Coster Gerard and Jim Ritchie developed a method of recovering oil by C02 injection. In April 1979 they formed Transpetco, with themselves as the operator and five corporations as nonoperators.[1] The original agreement adopted COPAS, an accounting procedure common in the oil and gas industry. Notably, this states that statements rendered to nonoperators by the operator are conclusively presumed to be true and correct after 24 months unless the nonoperator makes a written demand for adjustment.
According to Stanberry, a dispute arose with two nonoperators, so the operator bought them out but needed additional cash to continue the joint venture. They solicited Dallas oilman Hal Pettigrew to join the venture; Stanberry was uncertain of the precise dates, but he testified that Pettigrew, through his company Cardox Recovery, infused a significant amount of cash and obtained a large percentage stake in the venture.
liiOn December 1, 1992, the members executed an amended agreement continuing the business but restating the ownership interests (62.5% to TPJV, one of Pet-tigrew’s business entities, 15% each to Ritchie and Gerard, and 7.5% to Stanber-ry), creating a capital account for each member and stating that if a member’s capital account was negative at the time of a liquidating event, obligating that member to restore its account to a zero balance. The amended agreement named Stanberry as the operator. He testified that as a condition of continued participation in the joint venture, Pettigrew demanded a greater tax benefit, specifically a 100% allocation of Transpetco’s leasehold costs to TPJV. Stanberry agreed, as Pettigrew already controlled a majority of the joint venture. Transpetco’s 1993 audit report, sent to all members, noted “the basis of leasehold costs (all allocated to TPJV Corporation)”; all subsequent audit reports contained a similar statement.
Effective January 1, 1993, TPJV assigned its interest in Transpetco to another Pettigrew entity, Americo, with a full assumption of TPJVs position in the joint venture. Later, in 1997, Americo changed its name to Clearview Investments Inc.
Transpetco’s 1996 audit report showed that Americo had depleted its leasehold costs through amortization and had begun to run a negative capital account balance. There was no demand on Americo (or, later, on Clearview) to make up the deficit, however, because no liquidating event had yet occurred. The record shows that through 2009, Clearview received monthly statements and annual audit reports, but never challenged its 100% allocation of leasehold costs or its negative capital account balance. | -According to Stanberry, Clearview and its predecessors received distributions of $9.24 million over the life of the joint venture.
In June 2009, the liquidating event occurred, as Transpetco sold all or substantially all its assets. Transpetco’s controller, Patrick Woodall, demanded payment of Clearview’s negative capital account balance of $248,900, with no response. Several followup demands were sent in late 2009 and early 2010, also with no response.[2]

*52
Procedural History

Transpetco and its operator, Stanberry, filed this suit against Clearview in July 2010, demanding payment of Clearview’s negative capital account balance, $248,900, and attorney fees and costs under the amended agreement. The petition alleged the facts summarized above, including an allegation that “the joint venturers agreed to particular allocations of profit or loss[.]”
Discovery was complex and disputed. Clearview’s longtime CPA, Ware Shipman, contended there was a discrepancy: Clear-view’s ownership position was only 62.5%, yet the joint venture had allocated to Clearview leasehold costs of 100%; he demanded many more tax records from 1992-1997 to resolve this. Clearview filed a reconventional demand urging that if Transpetco had correctly allocated only 62.5% of leasehold costs to Clearview starting in 1993, Clearview would actually have a positive capital account balance of $200,651. Moreover, Clearview alleged that under the Internal Revenue Code (“IRC”), 26 U.S.C. §§ 743, 754, and a Treasury | ¿Regulation, 26 C.F.R. § 1.743-1 (“optional adjustment to basis of partnership property”), Transpetco was prohibited from allocating any more cost to a member than that member’s interest in the partnership capital.
Another discovery issue was Transpet-co’s effort to exclude the testimony of Pet-tigrew, the founder and key man in Clear-view and its predecessor entities, Cardox, Americo and TPJV. Pettigrew could have testified about the negotiations with the joint venture in 1992 and 1993 and whether he actually demanded a 100% allocation of leasehold costs as a condition of maintaining his 62.5% capital share of Tran-spetco. However, in late 2012 his health failed and he died prior to trial.

Action in the District Court

At trial in February 2013, Transpetco put on four witnesses.
Wallace Stanberry, Transpetco’s 88-year-old operator, testified that he invited Pettigrew to join the joint venture; in exchange for putting up the money, Petti-grew wanted a significant interest and disproportionate tax benefit. As a result, Pettigrew’s companies wound up with over 60% ownership, and with depletion of all leasehold costs, resulting in $9.2 million tax benefits over the life of the joint venture. Stanberry maintained that he complied with the amended agreement, filed all reports and tax returns timely, and that nobody ever contested any of his filings.
Patricia Jones, Stanberry’s executive vice-president, testified that Transpetco followed COPAS procedures and that she sent out monthly statements and annual reports, which nobody ever contested.
Patrick Woodall, Stanberry’s longtime accountant, testified that in 1.4992, TPJV put up $1.63 million, including leasehold costs of $1.28 million. This brought TPJV’s share of the joint venture’s oilfield assets to 62.5%, but TPJV received full allocation ,of leasehold costs, a major tax benefit. Woodall confirmed that using these numbers, Clearview went negative in 1996 and never restored its balance of $248,900. He also confirmed that he provided monthly data to Transpetco’s outside auditors.
C. Scott Massey, a CPA and attorney licensed in Texas, testified that he was Transpetco’s CPA for many years. He was not involved in the 1992 negotiations with Pettigrew and could not find any documentation of those dealings, but he recalled talking to Pettigrew’s CPA, Ship-man, about a § 754 declaration. He testified that members of a joint venture may agree to allocate costs as a tax benefit, and *53 such “special allocations” are allowed. Although a 100% allocation of costs to one member was “a bit unusual,” it was correct and TPJV was fully aware of it. Massey added that TPJVs predecessor, Cardox, also had a 100% allocation of leasehold costs. On cross-examination, Massey seemed to agree that the IRC and Treasury Regs set out “required calculations” whereby Clearview could not take more than its contribution of leasehold interest, 62.5%, but he later stated that the parties could agree to any allocation, and he “assumed” they had complied with 26 U.S.C. § 743(b).
Clearview called one witness, Ware Shipman, its longtime CPA, who specialized in partnership taxation. He confirmed that at the outset, TPJVs capital account was $1.6 million but its leasehold costs were only $1.28 million, or 62.5% of total capital. He testified that under the IRC and Treasury Regs, the joint venture could not allocate a greater cost deduction | fithan a partner’s ownership interest, and so what Transpetco did in 1992 was illegal. With the proper allocation, Shipman calculated, Clearview wound up with a positive balance in 2009 of $276,430. On cross-examination, Shipman seemed to concede that the parties could agree to allocate 100% of leasehold costs to one partner. He also conceded that nobody objected to the allocation when it was done, it was too late to amend any tax returns, and that his biggest client was Pettigrew business entities.
The district court ruled from the bench that all witnesses were truthful and credible, the only issue being the application of the IRC and Treasury Regulations. The court found the “weight of the evidence” supported Massey’s interpretation that the allocation was legal, given that nobody ever questioned it — including the Internal Revenue itself — until the liquidation occurred. Further, Pettigrew was a sophisticated investor (“this was not his first rodeo”) who could negotiate and bargain for his 100% allocation of leasehold costs, given his superior financial position. Getting this disproportionate allocation was a prudent way for him to “hedge his bets” in case the deal “went south.” The court also noted that under COPAS, Pettigrew had 24 months to dispute any statement, and never did so. The court rendered judgment in favor of Transpetco for $248,900. It later awarded attorney fees and costs, as provided in the amended agreement, of $100,493.
Clearview has appealed, raising one assignment of error.

The Parties’ Positions

By its sole assignment of error, Clear-view urges the court erred when it held that 26 U.S.C. § 743 and Treasury Regulation § 1.743-1 are not 17mandatory and could be altered by agreement. It argues that because the only issue is the interpretation of a statute, review is de novo, not manifest error. Thibodeaux v. Donnell, 2008-2436 (La.5/5/09), 9 So.3d 120. It contends that § 743 is specialized and rarely litigated, but it is mandatory in stating that a partner’s proportionate share of the adjusted basis of partnership property “shall be determined in accordance with his interest in partnership capital[.]”
Clearview also concedes that whether Pettigrew actually requested a 100% allocation in 1992 was a disputed fact, and it accuses Transpetco of changing its argument — from the original claim that it merely carried over a 100% allocation from Cardox to TPJV, to the later claim that Pettigrew demanded it. However, Clear-view submits this is irrelevant, given the mandate of § 743. It also cites the Regulation as stating that the transferee’s basis “is without regard to any prior transferee’s special basis adjustment.” It reiterates *54 the bulk of Shipman’s testimony, and cites a passage in which Transpetco’s expert, Massey, said the § 743 basis is mandatory and the 100% allocation is “not allowed.” It concludes that the trial court’s ruling is legally wrong and must be reversed.
Transpetco responds that the standard of review for factual findings is manifest error. Salvant v. State, 2005-2126 (La.7/6/06), 935 So.2d 646. It urges there was no evidence to contradict the showing that Pettigrew, TPJV’s principal, conditioned his involvement on a special allocation of 100% of leasehold costs, and not the 62.5% basis in that asset; in fact, the annual balance statements and audits confirm this, as does the evidence of the tax benefit accruing to Pettigrew from the allocation. Transpetco asserts | sthat the 1992 agreement is indeed material and the record supports the district court’s findings on every disputed issue. It further contends that because Clearview (1) failed to assign any factual errors, it has waived them on appeal, Lawson v. Lawson, 48,296 (La.App. 2 Cir. 7/24/13), 121 So.3d 769, and (2) failed to object to evidence of the 1992 agreement, it has waived that issue on appeal, Hollenshead Oil & Gas LLC v. Gemini Explorations Inc., 45,389 (La.App. 2 Cir. 7/21/10), 44 So.3d 809, writ denied, 2010-2046 (La.11/12/10), 49 So.3d 892. Finally, it cites passages in which both experts seemed to say the parties could agree to any allocation without violating 26 U.S.C. § 743, and urges that the court had the discretion to accept an expert’s interpretation of a tax code. Goudchaux/ Maison Blanche v. Broussard, 590 So.2d 1159 (La.1991). It concludes there was no manifest error and the judgment should be affirmed.

Discussion

Although Clearview frames the issue as one of statutory interpretation alone, we find that the court’s decision hinges largely on factual findings, which we will address first. In civil cases, the proper standard of appellate review is the manifest error-plainly wrong standard, which precludes the appellate court from setting aside a district court’s finding of fact in the absence of manifest error or unless that finding is clearly wrong. Snider v. Louisiana Med. Mut. Ins. Co., 2013-0579 (La.12/10/13), 130 So.3d 922; Hall v. Folger Coffee Co., 2003-1734 (La.4/14/04), 874 So.2d 90. To reverse a trial court’s factual findings, the appellate court must (1) find from the record that a reasonable factual basis does not exist for the finding, and 1 fl(2) that the record establishes that the finding is clearly wrong (manifestly erroneous). Hall v. Folger Coffee Co., supra; Stobart v. State, 617 So.2d 880 (La.1993). If the trial court’s factual findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse even though convinced that had it been sitting as a trier of fact, it would have weighed the evidence differently. Broussard v. State, 2012-1238 (La.4/5/13), 113 So.3d 175; Hall v. Folger Coffee Co., supra.
On close review, we discern no basis to disturb the district court’s findings. The record supports the essential finding that TPJV elected an allocation of 100% of leasehold costs; no witness or documents contradicted Stanberry’s recollection of the negotiations of 1992. The testimony of both parties’ CPAs, Massey and Ship-man, supports the finding that the allocation was a tax benefit to TPJV, even though it is not apparent that TPJV or Pettigrew claimed it during the period of amortization. The documents in evidence uniformly show that neither Pettigrew nor any of his business entities contested the initial election of the allocation or the periodic statements reflecting it, particularly the statements asserting the negative cap *55 ital account balance from 1996 onward. In short, the record amply supports that finding that in 1992 Pettigrew demanded, negotiated for, and received the 100% allocation for Clearview’s predecessor, an allocation that Clearview now seeks to negate under the provisions of the IRC.
Clearview’s assigned error contests the interpretation of a statute. It is therefore a question of law to be reviewed de novo. Silver Dollar Liquor v. Red River Parish, 2010-2776 (La.9/7/11), 74 So.3d 641; Thibodeaux v. Donnell, supra. When a law is clear and unambiguous and its application |indoes not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. La. C.C. art. 9; Cacamo v. Liberty Mutual Fire Ins. Co., 99-3479 (La.6/30/00), 764 So.2d 41. The words of a law must be given their generally prevailing meaning. La. C.C. art. 11; First Nat’l Bank, USA v. DDS Const. LLC, 2011-1418 (La.1/24/12), 91 So.3d 944.
The statute in question, 26 U.S.C. § 743, provides (in pertinent part, with emphasis added and footnote supplied):
(a) General rule. — The basis of partnership property shall not be adjusted as the result of a transfer of an interest in a partnership by sale or exchange or on the death of a partner unless the election provided by section 754 (relating to optional adjustment to basis of partnership property)[3] is in effect with respect to such partnership or unless the partnership has a substantial built-in loss immediately after such transfer.
(b) Adjustment to basis of partnership property. — In the case of a transfer of an interest in a partnership by sale or exchange or upon the death of a partner, a partnership with respect to which the election provided in section 751 is in effect or which has a substantial built-in loss immediately after such transfer shall—
(1) increase the adjusted basis of the partnership property by the excess of the basis to the transferee partner of his interest in the partnership over his proportionate share of the adjusted basis of the partnership property, or
(2) decrease the adjusted basis of the partnership property by the excess of the transferee partner’s proportionate share of the adjusted basis of the partnership property over the basis of his interest in the partnership.
Under regulations prescribed by the Secretary, such increase or |^decrease shall constitute an adjustment to the basis of partnership property with respect to the transferee partner only. A partner’s proportionate share of the adjusted basis of partnership property shall be determined in accordance with his interest in partnership capital
The regulation cited, § 1.743-1, provides an example (with emphasis added):
(f) Subsequent transfers. Where there has been more than one transfer of a partnership interest, a transferee’s basis adjustment is determined without regard to any prior transferee’s basis adjustment. In the case of a gift of an *56 interest in a partnership, the donor is treated as transferring, and the donee as receiving, that portion of the basis adjustment attributable to the gifted partnership interest. The provisions of this paragraph are illustrated by the following example:
Example, (i) A, B, and C form partnership PRS. A and B each contribute $1,000 cash, and C contributed land with a basis and fair market value of $1,000. When the land has appreciated in value to $1,300, A sells its interest to Tl for $1,100 (one-third of $3,800, the fair market value of the partnership property). An election under section 754 is in effect; therefore, Tl has a basis adjustment under section 743(b) of $100.
(ii) After the land has further appreciated in value to $1,600, Tl sells its interest to T2 for $1,200 (one-third of $3,600, the fair market value of the partnership property). T2 has a basis adjustment under section 743(b) of $200. This amount is determined without regard to any basis adjustment under section 743(b) that Tl may have had in the partnership assets.
While the emphasized passages lend some support to Clearview’s argument, we find on de novo review that nothing in § 743 nullifies an allocation that is inconsistent with the statute. A plain reading shows that § 743 limits allocations of partnership interests for federal tax purposes, but it does not purport to restrict the allocation of capital among the partners themselves.
Certain facts fortify the plain reading. Massey testified that with the § 754 election in place, the allocation was “volitional,” and Shipman stated, 112in response to questions by the court, “Could the parties independently agree to do some special allocations as part of the agreement, independent of the § 754 election? The answer is, yes.” Even though Massey considered the allocation “unusual,” it reflected Pettigrew’s superior bargaining power with Transpetco. Notably, nothing in the record shows that Internal Revenue ever challenged the allocation. More notably, in nearly 20 years of the existence of the joint venture, neither Clear-view, its predecessors, nor its principal, Pettigrew, ever challenged the allocation. These facts show that everyone involved considered the allocation valid, at least until the liquidating event.
In short, we detect no manifest error in the district court’s factual findings, and on de novo review we find that 26 U.S.C. § 743 did not nullify the allocation. Clear-view’s assignment of error lacks merit.

Answer to Appeal

By answer to appeal, Transpetco seeks additional attorney fees for handling the appeal. It suggests $7,500, the amount deemed reasonable in Hirsch v. Calm Elec. Co., 29,327 (La.App. 2 Cir. 5/9/97), 694 So.2d 636, writ denied, 97-1561 (La.10/3/97), 701 So.2d 200.
The amended agreement expressly provided for reasonable attorney fees and costs in the event of default; the district court awarded Transpetco attorney fees and costs of $100,493. A plaintiff who is entitled to an attorney fee by statute or contract, and who actually receives one at trial, is ordinarily entitled to an additional attorney fee for handling the defendant’s unsuccessful appeal. Frith v. Riverwood Inc., 2004-1086 (La.1/19/05), 892 So.2d 7; Hollenshead v. Gemini Explorations Inc., supra. A reasonable attorney fee is determined by the factors set forth in the Code of Professional Conduct, Rule 1.5(a).[4] *57 Smith, v. State, 2004-1317 (La.3/11/05), 899 So.2d 516. Considering the length and complexity of the case, the obvious expertise of the attorneys on both sides, and the amount of the fee already awarded, we find an additional award of $5,000 is reasonable for handling the appeal.

Conclusion

For the reasons expressed, we affirm the judgment in its entirety. Judgment is further rendered in favor of Transpetco I Joint Venture, Wallace Stanberry and Stanberry Oil Co., and against Clearview Investments Ltd. for the additional attorney fee of $5,000. All costs are to be paid by Clearview Investments Ltd.
AFFIRMED AND ADDITIONAL ATTORNEY FEE AWARDED.

. The nonoperators were Halliburton Co., Dorchester Gas Producing Co., Eagleton Engineering Co., Texas Energy Services Inc. and Baker & Baker Drilling Co.

. Statements also showed that Stanberry had a negative capital account balance, which he restored timely.

. 26 U.S.C. § 754 provides: “If a partnership files an election, in accordance with regulations prescribed by the Secretary, the basis of partnership property shall be adjusted, * * * in the case of a transfer of partnership interest, in the manner provided in Section 743. Such an election shall apply to * * * all transfers of interests in the partnership during the taxable year with respect to which such election was filed and all subsequent taxable years. Such election may be revoked by the partnership, subject to such limitations as may be provided by regulations prescribed by the Secretary.”

. Factors include (1) the time and labor required, the novelty or difficulty of the issues, *57 and the skill required to properly perform the legal services; (2) the likelihood, if apparent to the client, that the matter will preclude other employment; (3) the fee customarily charged in the locality for similar services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer; and (8) whether the fee is fixed or contingent.